IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 26, 2022 Session

**STATE OF TENNESSEE v. ROY MICHAEL FORD**

**Appeal from the Criminal Court for Claiborne County**
**No. 2015-CR-2222  E. Shayne Sexton, Judge**

———————————————————

**No. E2021-00780-CCA-R3-CD**

———————————————————

Roy Michael Ford, Defendant, was indicted for several offenses in relation to the death of Scotty Brogan, the victim.  Defendant sought severance of the second degree murder charge from the remaining offenses.[1]  The trial court granted the request and Defendant proceeded to trial on the second degree murder charge.  After a jury trial, Defendant was found guilty of second degree murder and sentenced to 17 years in incarceration. Defendant appeals, arguing that: (1) the evidence was insufficient to support the second degree murder conviction; (2) the trial court erred in admitting a photograph of the deceased victim; (3) the trial court improperly permitted a witness to testify about what she would have done had she been in Defendant's position; and (4) his sentence is excessive. After a review of the record, we affirm the judgment of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Gregory P. Isaacs and J. Franklin Ammons (on appeal); and Wesley Stone (at trial), Knoxville, Tennessee, for the appellant, Roy Michael Ford.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Jared R. Effler, District Attorney General; and Graham Wilson and Matt McClung, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

---

[1] This appeal pertains solely to Defendant's conviction for second degree murder.

In September of 2015, the Claiborne County Grand Jury returned an indictment charging Defendant with second degree murder, attempted escape, and three counts of assault. The second degree murder charge was severed from the remaining counts of the indictment and proceeded to trial.

At trial, the following facts were established. Defendant and the victim both lived on Ausmus Lane in Claiborne County. The victim's home was past Defendant's home on the narrow gravel lane.

Defendant' wife, Dorothy Ford, has a niece named Stacy Evans. Ms. Evans was the victim's girlfriend. Ms. Evans started dating the victim in 2011 and the couple have a young daughter together. Ms. Evans, acknowledged that the victim was a drug addict who used methamphetamine daily.[2]

Four days before the victim was shot, Defendant's wife, became concerned that Ms. Evans and the victim were using drugs. Mrs. Ford knew that "DCS" had been to the victim's home before and feared that Ms. Evans would lose custody of her daughter if the rumors about drug activity were true. Mrs. Ford called Ms. Evans to express her concern about the situation.

The victim learned about Mrs. Ford's phone call. He was upset. The victim called Defendant's house. Defendant answered the phone. The victim asked to talk to Mrs. Ford. During this call, Ms. Evans overheard the victim arguing with Defendant on the phone. She heard Defendant tell the victim they should talk "like men face to face." The victim declined.

During her testimony for the defense, Mrs. Ford said that she heard the victim threaten to "shut that bitch's mouth once and for all" during his phone conversation with Defendant. Mrs. Ford assumed that the victim was referring to her during the conversation with Defendant. She called 911.

According to Ms. Evans, a short while later, police appeared at her and the victim's home. The police questioned them about the extent of the phone call argument. The victim explained that he and Defendant had spoken on the phone. After the officer left, the victim went to the store. When he returned from the store, another officer was at Defendant's house. That officer followed the victim to his home. The officer asked the victim about "problems with the neighbors."

---

[2] At the time of the trial, Ms. Evans was incarcerated in Shelbyville, Kentucky, for promoting contraband.

On May 30, 2015, four days after the telephone call from the victim to Defendant, Defendant and the victim left their homes at around the same time. The victim was driving a truck pulling a trailer owned by his employer, ZWT Ranch. Defendant was driving a blue Ford Fusion, accompanied by his wife in the passenger seat and his stepson, Robert Heatherly, in the back-passenger seat. The three were headed to a church picnic.

At the end of Ausmus Lane, the victim turned right. Defendant would have ordinarily turned left to go to church, but he turned right, claiming in his police interview that the victim pulled over and motioned for him to follow. The victim pulled his truck to the side of the road. Defendant passed the victim's truck, made a U-turn, and pulled his car next to the truck such that the driver's side doors were facing each other about two feet apart.

According to Defendant's police interview, when Defendant stopped his car next to the victim's truck, the victim started "cussing [at] and threatening" him. The victim appeared to be upset about Mrs. Ford's telephone call. Defendant claims that he tried to explain to the victim why Mrs. Ford was concerned about the victim's child. Defendant said that the victim got out of his truck and told Defendant to hit him. Defendant declined, remaining behind the wheel of his car, and the victim leaned toward Defendant's car and punched Defendant in the face. Defendant told police that he pulled his pistol out of his pocket and placed it next to him in the car, telling the victim that he would "blow [his] brains out" if the victim punched him again. At that point, Defendant told police that it looked like the victim was leaning toward him to punch him again. Defendant picked up his gun and shot the victim, telling police that he "wasn't going to take it again" and that he was "defending [his] car." The victim turned and started to run away, falling against the front of Defendant's car. Defendant fired a second shot toward the victim. Defendant claimed that he was afraid the victim was going to come back toward him. The victim ran away from Defendant's car and fell into a ditch near the end of the trailer. Defendant denied that he fired a third gunshot but did not deny that there were three shell casings found at the scene. After being questioned for about 45 minutes, Defendant informed police that the victim told him he had a gun in his truck.

Mr. Heatherly, seated in the back passenger seat, was looking at his phone when they pulled out of Ausmus Lane and onto Highway 63. He recalled that when the car stopped next to the victim's truck, Defendant and the victim started arguing immediately. Mr. Heatherly testified that the victim jumped out of his truck and stuck his head inside the window of Defendant's car. The victim punched Defendant in the face just before Defendant shot out the window at the victim. Mr. Heatherly claimed that Defendant called the first shot a "warning shot." Next, Mr. Heatherly recalled the victim walking to the back of the car, removing and replacing his sunglasses, and then walking back to the driver's side window of the car. Mr. Heatherly stated that the victim stuck his head back into

Defendant's car, yelling at Defendant. The victim punched Defendant a second time, and Defendant shot the victim. The victim ran away. Defendant shot in the air the third time. Mr. Heatherly described Defendant as scared. Counsel for the State asked Mr. Heatherly whether he would have shot the victim. Counsel for Defendant objected based on relevance. The trial court overruled the objection. Mr. Heatherly continued that he did not "know how to answer that really, to be honest with you."

Two cars drove by the scene around the time of the shooting. One car was occupied by Carol Wade, who was traveling north on Highway 63 with her mother, niece, and two sons in the car. Ms. Wade's mother was driving the car. Ms. Wade was in the passenger seat. She saw the blue Ford and the gray truck stopped on the side of the road. The victim was "leaning" up against the driver's door of the truck. Defendant was yelling at the victim and had a gun in his left hand. Ms. Wade denied testifying at the preliminary hearing that she heard the victim yelling.

The car in which Ms. Wade was riding went past the two vehicles, turned around, and came back toward the scene. As they approached from the other direction, Ms. Wade saw Defendant point a gun out the window and saw Defendant fire the gun at the victim. Ms. Wade called 911.

Ms. Wade's mother, Carolyn Russell, confirmed that she was driving the car on the day of the incident. She saw the victim leaning up against his truck and heard yelling. Ms. Wade told her to turn the car around after seeing a gun. As Ms. Russell drove back toward the scene, she heard a gunshot.

David Minton and his wife were driving on Highway 63 around the time of the incident. He saw a man run behind a trailer and dive. Mr. Minton was concerned about what he saw, so he turned around and parked his car near the two vehicles. He approached Defendant's car and asked him if the victim needed help. Defendant was shaking. Defendant admitted that he shot the man. Defendant's face was red and his lip appeared swollen. Defendant told Mr. Minton that he had been hit. Defendant also told Mr. Minton that the victim had a gun and had been selling drugs to Defendant's niece.

Detective Brad Duncan with the Claiborne County Sheriff's Office arrived on the scene around 4:30 p.m. after receiving a call from dispatch. He observed Defendant's and the victim's cars were two to three feet apart. Detective Duncan recovered three fired shell casings and two unfired cartridges. The victim was lying prone in a ditch. Defendant claimed that the victim hit him so hard that it nearly knocked him out, but Detective Duncan did not observe any injuries to Defendant's face. Detective Duncan did not see any tire tracks in the grass off Highway 63 but admitted that he was not looking for tire tracks on the day of his investigation.

The investigation revealed that the three shell casings recovered from the scene were fired from Defendant's revolver. Additionally, gunshot residue was found inside Defendant's car.

An autopsy revealed that the victim suffered two gunshot wounds. One of the bullets entered through the right side of his chest and exited the left side of his back. The other bullet entered at the base of the victim's right thumb and exited on the palm. The victim had gunpowder on the back of his hand, indicating that the shot was fired from a close distance. The medical examiner opined that it was possible both gunshot wounds were caused by the same projectile. The victim died as a result of the gunshot wound to his chest. The victim also had blunt trauma injuries associated with a "terminal fall," in other words from falling to the ground after being shot. The victim had both methamphetamine and amphetamine in his system at the time of his death.

Defendant presented the testimony of his wife as his single witness. Mrs. Ford testified that as they left the house and the victim turned right on Highway 63, the victim drove through the grass next to the road and motioned for Defendant to follow him. Mrs. Ford recalled that the victim was yelling at them about trying to take his daughter. Mrs. Ford testified that Defendant did not yell. Mrs. Ford claimed that the victim threatened to get his gun but that she never saw the victim with a gun. Mrs. Ford admitted that the victim might have been telling Defendant to get his gun. Mrs. Ford also admitted that she had never spoken to the victim before the telephone call but claimed that the victim "always had the gun in the truck." When the victim got out of his truck, Mrs. Ford saw the victim hit Defendant in the face, and Defendant "shot him." Mrs. Ford testified that the victim was cussing at her and screaming about his baby. Mrs. Ford was afraid of the victim. After being shot, the victim stumbled away, stopped at the front of the car, and then came back toward the driver's side of the car. Mrs. Ford recalled Defendant shooting two or three times.

Defendant did not testify at trial. In his statement to police, he admitted shooting the victim. He consistently maintained his actions were in self-defense.

In its rebuttal proof, the State called Shayne Evans, Defendant's nephew and neighbor, who testified that Defendant and the victim had an existing conflict. Mr. Evans said he saw both Defendant and his stepson, Robert Heatherly, making angry gestures toward the victim as the victim drove by their house on at least two occasions around the time of the shooting. Mr. Evans described Defendant as having a "short fuse" and a reputation for violence.

Christopher Hall, another neighbor, agreed that Defendant had a reputation for violence.  Bryan Alexander, one of the victim's coworkers, described the victim as a peaceful person.  Mr. Alexander admitted that he was unaware of the victim's drug use.

At the conclusion of the proof, the jury found Defendant guilty of second degree murder.  After a sentencing hearing, the trial court sentenced Defendant to a sentence of 17 years in incarceration at 100% service for the conviction.  Defendant appealed.

*Analysis*

*Sufficiency of the Evidence*

Defendant argues that the evidence is insufficient to support the conviction for second degree murder.  While not disputing that he shot the victim, Defendant insists that he acted "in justifiable self-defense" because Defendant did not have a duty to retreat where he was "presumed to have held a reasonable belief of death or serious bodily injury."  Additionally, Defendant contends that even if he did not act in justifiable self-defense, the proof only supported a conviction for voluntary manslaughter.  The State argues that the evidence was sufficient because the proof was such that a rational jury could have easily found Defendant's use of force was not justified, supporting the conviction for second degree murder.  In other words, the State insists that the evidence supported the conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles.  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict.  *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).  The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom."  *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact.  *Reid*, 91 S.W.3d at 277.  Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact."  *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).  "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory."  *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651,

659 (Tenn. 1997)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

In relevant part, second degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(22).

Defendant relied on a theory of self-defense. In Tennessee, the right to use deadly force in self-defense is limited to circumstances in which a person reasonably and sincerely believes there is an imminent threat of death or serious bodily injury. *See* T.C.A. § 39-11-611. At the time of Defendant's offense, May of 2015, the self-defense statute read, in pertinent part, as follows:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> (C) The belief of danger is founded upon reasonable grounds.
> . . . .
> (c) Any person using force intended or likely to cause death or serious bodily injury within a residence, business, dwelling or vehicle is presumed to have held a reasonable belief of imminent death or serious bodily injury to self, family, a member of the household or a person visiting as an invited guest, when that force is used against another person, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, business, dwelling or vehicle, and the person using defensive force knew or had reason to believe that an unlawful and forcible entry occurred.

T.C.A. § 39-11-611(b)(2) and (c) (effective Mar. 23, 2012 to April 5, 2016). Deadly force is "the use of force intended or likely to cause death or serious bodily injury. T.C.A. § 39-11-611(4). "Serious bodily injury" involves: "[a] substantial risk of death," [p]rotracted unconsciousness," "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. . . ." T.C.A. § 39-11-106.

The threat or use of force is not extended to situations where the person asserting the self-defense claim provoked the victim. The threat or use of force against another is not justified if the person using force provoked the other individual's use or attempted use of unlawful force, unless: "[t]he person using force abandons the encounter or clearly communicates to the other the intent to do so" and "[t]he other person nevertheless continues or attempts to use unlawful force against the person." T.C.A. § 39-11-611(e)(2).

In this case, the proof showed that Defendant followed the victim and pulled his vehicle next to the victim's truck alongside Highway 63 such that their driver's side doors were facing each other. One passerby saw the victim outside of his truck standing next to Defendant's vehicle, while Defendant pointed a gun at and yelled at the victim. Mr. Heatherly, Mrs. Ford, and the Defendant all claimed that the victim was the first aggressor, leaning into Defendant's vehicle and punching Defendant in the face. Detective Duncan testified that he did not see any visible injuries to Defendant's face. Character witnesses testified that Defendant had a reputation for violence, whereas character witnesses for the victim testified that he had a reputation for non-violence. There was no gun found on or near the victim.

Defendant seems to argue that the "castle doctrine" exempts him from criminal liability because he was presumed to have held a reasonable belief of imminent death or serious bodily injury while he was in his vehicle and the State did not present proof to rebut this presumption. This argument was clearly communicated to the jury by Defendant from jury selection to verdict. The jury heard the proof and rejected Defendant's theory of self-defense. Moreover, the jury was specifically instructed on the differences between the lesser-included offenses and second-degree murder as well as self-defense. In returning the verdict of second degree murder, the jury weighed the evidence and determined the credibility of the testimony. They reached a decision that Defendant acted knowingly and did not find that he acted in self-defense. By finding Defendant guilty of the indicted offense, the jury necessarily rejected any of the charged lesser-included offenses. This was certainly within the jury's purview, and this Court will not reweigh the evidence. *Reid*, 91 S.W.3d at 277. Defendant is not entitled to relief.

*Admissibility of Photograph*

Defendant next argues that the trial court improperly admitted a photograph of the victim at the crime scene. Specifically, Defendant argues that the photograph was unfairly prejudicial and gruesome because it had "zero relevance to issues raised at trial." The State disagrees, arguing that the trial court acted within its discretion. Alternatively, the State insists that any error in the admission of the photograph was harmless.

The admissibility of photographic evidence lies within the sound discretion of the trial court, and its ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (quoting Tenn. R. Evid. 403 Advisory Comm. Cmts.). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. To decide whether visual evidence is admissible, the court determines the relevance of the evidence and weighs its probative value against any undue prejudice. *Id.* It is deemed "unfairly prejudicial" if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*

Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issue at trial and their probative value is not substantially outweighed by their prejudicial effect. *Banks*, 564 S.W.2d at 949-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." *Id.* at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). "As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." *State v. Collins*, 986 S.W.2d 13, 21 (Tenn. Crim. App. 1998).

Here, there was some discussion about the admissibility of photographs in a jury-out hearing. The trial court permitted the State to admit one color photograph of the deceased victim lying on his back in a ditch at the scene. There is a bloodstain on the victim's shirt and abrasions are visible on the victim's face, however there is a shadow obscuring part of the victim's face, making it difficult to see the extent of the victim's facial injuries. The photograph is not overly bloody. In our view, the photograph was relevant to establish the victim's cause of death as well as to corroborate the testimony that the victim retreated after being shot by Defendant as also evidenced by the trail of blood from Defendant's car to the ditch. We also conclude that the probative value was not substantially outweighed by the danger of unfair prejudice. Despite Defendant's insistence that the photograph was gruesome, we determine that the trial court did not abuse its discretion in admitting the photograph. "'[P]hotographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used.'" *State v. Willis*, 496 S.W.3d 653, 728 (Tenn. 2016) (quoting *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011), *perm. app. denied* (Tenn. Dec. 14, 2011)). "Thus, the fact that the State

could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." *Banks*, 564 S.W.2d at 951. Defendant is not entitled to relief on this issue.

*Improper Questioning of Witness*

Next, Defendant argues that the trial court "erred in admitting speculative and irrelevant testimony from Mr. Heatherly about whether he would have shot [the victim]." Specifically, Defendant argues that the testimony was irrelevant and the error was not harmless. The State disagrees, pointing out that Mr. Heatherly's response to the question was, at most, equivocal, and that the trial court did not err in permitting counsel to question the witness.

Here, Defendant complains about the following exchange at trial during the direct testimony of Mr. Heatherly. Counsel for the State asked the witness whether he would have shot the victim if he were in Defendant's position. The following exchange occurred:

Counsel for State: Based on what you saw there, Mr. Heatherly, here under oath today, would you have shot [the victim]?

Counsel for Defendant: Judge, it's not relevant.

Court: Overrule the objection.

Mr. Heatherly: I don't know how to answer that really.

Counsel for the State: You can't say?

Mr. Heatherly: I don't know – I don't know how to answer it.

The threshold issue with regard to the admissibility of evidence is relevance. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. Witnesses are permitted to give opinion testimony if it is "rationally based on the perception of the witness" and is "helpful to a clear understanding of the witness's testimony of the determination of a fact in issue." Tenn. R. Evid. 701(a). In general, witness "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Tenn. R. Evid. 704.

- 10 -

Counsel for the State likely asked this question to ascertain whether Defendant, who was relying on a theory of self-defense, reasonably feared imminent death or serious bodily injury at the time he shot the victim. *See* T.C.A. § 39-11-611(b)(2)(A). In our opinion, Mr. Heatherly's response to the question was nonresponsive. Moreover, Defendant fails to articulate how the testimony could have affected the jury. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant also contends that the trial court gave him an excessive sentence. Specifically, he complains that the trial court applied an outdated enhancement factor and that as a result he should receive a new sentencing hearing. The State responds that the trial court properly sentenced Defendant. We agree with the State.

This Court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the result of the validated risk and needs assessment, and the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(b), -103.

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

Here, the trial court considered the relevant principles and sentenced Defendant to a within-range sentence for his conviction. Defendant was sentenced as a Range I offender convicted of a Class A felony, with a range of punishment of 15 to 25 years. *See* T.C.A. §§ 39-13-210(c)(1), 40-35-112(a)(1).

Defendant argues that the trial court abused its discretion by applying an enhancement factor that was not in existence at the time of sentencing, Tennessee Code Annotated section 40-35-114(17) (2003) (repealed June 7, 2005), the crime was committed under circumstances under which the potential for bodily injury to a victim was great. While the trial court did improperly apply this enhancement factor, the trial court applied one other enhancement factor and two mitigating factors before arriving at the 17-year sentence, just two years above the minimum sentence. Although Defendant asserts that the trial court improperly applied a non-existent enhancement factor, the misapplication of an enhancement factor does not remove the presumption of reasonableness and is no longer the basis for an appeal. *Bise*, 380 S.W.3d at 706, 709.

The remaining enhancement factor, the use of a firearm during the commission of the offense, did apply. *See State v. Raines*, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994) (applying this enhancement factor to a second degree murder conviction). "The application of a single enhancement factor can justify an enhanced sentence." *State v. John M. Banks*, No. M2019-00017-CCA-R3-CD, 2020 WL 5015888, at *10 (Tenn. Crim. App. Aug. 25, 2020) (citing *State v. Bolling*, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001)), *perm. app. denied* (Tenn. Dec. 2, 2020). The fact that the trial court misnumbered the enhancement factor in the sentencing memorandum is of no consequence. We also point out that the trial court would have been within its discretion to impose a maximum in-range sentence without finding any applicable enhancement factors, "as long as there are reasons consistent with the statutory purposes and principles of sentencing." *State v. Christopher Scott Chapman*, No. M2011-01670-CCA-R3-CD, 2013 WL 1035726, at *9 (Tenn. Crim. App. Mar. 13, 2013) (citing *Bise*, 380 S.W.3d at 706; *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008)), *no perm. app. filed*.

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within-range sentence. Based on the evidence presented at the sentencing hearing and provided in the presentence report, the sentence imposed was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that Defendant is not entitled to relief as to this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE